IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **FBCC CITYPOINT LP,**<br>    *Plaintiff*,<br><br>v.<br><br>**THE CITY OF AUSTIN and STEVE ADLER, NATASHA HARPER-MADISON, VANESSA FUENTES, SABINO "PIO" RENTERIA, JOSE "CHITO" VELA, ANN KITCHEN, MCKENZIE KELLY, LESLIE POOL, PAIGE ELLIS, KATHIE TOVO, ALISON ALTER, JOSE ROIG, and MATTHEW NORIEGA, IN THEIR OFFICIAL CAPACITIES,**<br>    *Defendants*. | § § § § § § § § § § § § § § § § § § §   Case No. 1:22-CV-01272 |

## ORIGINAL COMPLAINT

1.      FBCC CityPoint, LP ("FBCC") is in the business of housing people. Since 2014, FBCC has owned and operated apartment complexes in the City of Austin, including Mueller Flats, an apartment complex with nearly 400 apartment units located in Northeast Austin. Mueller Flats ran well and without major incident until Winter Storm Uri devastated Austin in February 2021. Uri knocked out power for nearly 70 percent of Texans, and disrupted water utilities that left hundreds of thousands without heat or running water for days. The damage caused by Uri statewide has been estimated at $80 billion to $130 billion. Uri did not spare Mueller Flats or its residents.

2.      Austin Energy provided Mueller Flats no quarter from Uri's impact. Not only did it cease providing power to Mueller Flats, such that Mueller Flats was unable to heat its apartment units—causing hundreds of pipes burst throughout the complex and both of its boilers to become inoperable—but, after the lights came back on, the City of Austin ("City") put FBCC in a catch-

1

22—issuing notices of violation for damages Mueller Flats suffered. Of course, it was impossible to comply with the notices considering the timing and the extent of the damage. Undeterred, the City continued to fine FBCC even though FBCC had no way to cure the violations, including because of the City's own actions. Mueller Flats has completed all the repairs, but because of the putative violations, the City added Mueller Flats to its "Repeat Offender List" ("ROP").

3.  Mueller Flats now must pay an annual fee, submit to periodic inspections of the property, and display 12-inch by 24-inch signs notifying residents that Mueller Flats is registered as a "repeat offender." Further, once a property is registered in the ROP, the Austin Code Department may suspend the property's rental registration—*i.e.* prohibit the property from leasing vacant units—for any one of numerous reasons, in the Code Department's sole discretion. The ROP is unconstitutional and adding Mueller Flats to the ROP was an unconstitutional taking. To remedy the City's unconstitutional actions, FBCC Citypoint LP ("FBCC") now files this Original Complaint against Defendant, the City of Austin.

In support, FBCC respectfully shows as follows:

## PARTIES

4.  FBCC is a limited partnership that owns and manages Mueller Flats Apartments ("Mueller Flats"). Mueller Flats is located at 1071 Clayton Lane, Austin, TX 78723. FBCC's principal place of business is in Austin, Texas.

5.  Defendant the City of Austin ("City") is a governmental entity located in Austin, Texas. The City can be served with process through the City's clerk, Jannette Goodall, Austin City Hall, 301 West Second Street, Suite 1120, Austin, TX 78701.

6.  Defendant Steve Adler is sued in his official capacity as the mayor of the City of Austin. Mr. Adler can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever he may be found.

7. Defendant Natasha Harper-Madison is sued in her official capacity as the City of Austin Council Member for District 1. Ms. Harper-Madison can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever she may be found.

8. Defendant Vanessa Fuentes is sued in her official capacity as the City of Austin Council Member for District 2. Ms. Harper-Madison can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever she may be found.

9. Defendant Sabino "Pio" Renteria is sued in his official capacity as the City of Austin Council Member for District 3. Mr. Renteria can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever he may be found.

10. Defendant Jose "Chito" Vela is sued in his official capacity as the City of Austin Council Member for District 4. Mr. Vela can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever he may be found.

11. Defendant Ann Kitchen is sued in her official capacity as the City of Austin Council Member for District 5. Ms. Kitchen can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever she may be found.

12. Defendant Mackenzie Kelly is sued in her official capacity as the City of Austin Council Member for District 6. Ms. Kelly can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever she may be found.

13. Defendant Leslie Pool is sued in her official capacity as the City of Austin Council Member for District 7. Ms. Pool can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever she may be found.

14. Defendant Paige Ellis is sued in her official capacity as the City of Austin Council Member for District 8. Ms. Ellis can be served with process at 301 W. 2nd St. Austin, Texas 78701

or wherever she may be found.

15.     Defendant Kathie Tovo is sued in her official capacity as the City of Austin Council Member for District 9.  Ms. Tovo can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever she may be found.

16.     Defendant Alison Alter is sued in her official capacity as the City of Austin Council Member for District 10.  Ms. Alter can be served with process at 301 W. 2nd St. Austin, Texas 78701 or wherever she may be found.

17.     Defendant Jose Roig is sued in his official capacity as the Director of the City of Austin Code Department.  Mr. Roig can be served with process at 5202 E Ben White Blvd, Suite 550, Austin, TX, United States, 78741 or wherever he may be found.

18.     Defendant Matthew Noriega is sued in his official capacity as Division Manager of the City of Austin Code Department.  Mr. Noriega can be served with process at 5202 E Ben White Blvd, Suite 550, Austin, TX, United States, 78741 or wherever he may be found.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331 and 28 U.S.C. § 1367(a).  The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201, and 2202, and its inherent equitable powers.

20.     This Court has personal jurisdiction over the City.

21.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the defendant resides in Austin, Texas, and a substantial part of the events and property at issue are situated in Austin, Texas.

## FACTUAL BACKGROUND

22.     Mueller Flats is an apartment complex with nearly 400 units.  FBCC has owned and operated Mueller Flats since September 2014.  During Winter Storm Uri, Austin Energy failed

4

and intentionally refused to provide power to Mueller Flats over a span of several days while temperatures remained significantly below freezing. Because Austin Energy did not provide power, Mueller Flats was unable to heat its apartment units and suffered hundreds of burst pipes throughout its apartment complex, leading to extensive water damage. Mueller Flats suffered approximately 700 separate water leaks throughout its apartment complex. Mueller Flats's boilers were also damaged, rendering them inoperable and preventing Mueller Flats from providing hot water to apartment residents.

23. Immediately following the storm and for the next several months, Mueller Flats worked tirelessly to fix all of the repairs and provided accommodations to tenants, including renting hotel rooms to allow for showers and other hygiene needs. In all, Mueller Flats suffered damages in excess of $2,000,000 as a result of burst pipes and other freeze-related damage throughout the building, including plumbing repairs in over 200 units in sixteen buildings. Mueller Flats sought to apply for permits from the City of Austin to expedite repairs to its apartments. Mueller Flats also acquired a temporary boiler to provide hot water to its residents. Mueller Flats did this without receiving a single dollar from insurance, while those claims were pending. Notably, a landlord in Texas is not required to begin repairing damage resulting from an insured casualty loss "until the landlord receives the insurance proceeds." TEX. PROP. CODE § 92.054(a).

24. Just two days after the storm ended and before Mueller Flats received any insurance proceeds, the City of Austin began serving notices of violation on Mueller Flats for damages inflicted by the freezing temperatures. At that time, Austin (and much of the State of Texas) was in a state of ongoing disaster.

25. The vast majority of the notices of violation served by the City concerned (a) Mueller Flats' inability to provide hot water reaching 110 degrees because its boiler had been

rendered inoperable by damage incurred in connection with the freeze; (b) water damage incurred when pipes throughout Mueller Flats' apartment complex burst during Winter Storm Uri; and (c) sheetrock and drywall sections that had been removed from apartment walls to access pipes damaged by the freeze.

26. The notices of violations served on Mueller Flats for failure to provide hot water purported to require Mueller Flats to "[o]btain all required permits for property and supply hot water . . . within two days." But it was impossible for Mueller Flats to comply with the notices of violation because the City of Austin was not able to process the large volume of permit applications submitted in the wake of Winter Storm Uri and due to the length of time it takes to replace and repair large-scale boilers.

27. In light of the City's failure to process the huge backlog of permit applications, the City enacted an ordinance in April 2021 allowing city officials to "exempt certain plumbing activities from the permit requirement." *See* Ordinance No. 20210422-052 ("[T]he city council finds that the need to repair and reconstruct damaged property and structures constitutes an emergency."). Although the ordinance recognized that "the permit requirement may . . . result in delays that are counter to the City's health and safety interests," *see id.*, the City refused to resolve notices of violation until permits were approved authorizing the necessary repairs.

28. The City also formed a "special team . . . to address the backlog of commercial [permit] applications." As of at least May 22, 2021, the City had not resolved the backlog of commercial applications.

29. When Mueller Flats first sought to apply for permits to complete repairs, the City represented that Mueller Flats would not need permits to accomplish most of the necessary repairs because the City had waived certain permitting requirements related to plumbing and sheetrock

6

repairs in the wake of Winter Storm Uri.  However, after issuing dozens of notices of violation to Mueller Flats, and after Mueller Flats had completed many of the repairs, the City changed course and stated that Mueller Flats would need permits for most plumbing, sheetrock, and boiler repairs.

30. The City did not provide consistent or intelligible guidance regarding these permitting requirements.  For example, with respect to plumbing repairs, the City variously represented: that permits are required for any plumbing repairs over 12 inches; for any plumbing repairs over 12 feet; for any plumbing repairs over 2 feet; and that permits are not required for plumbing repairs at all.  The City promulgated similarly inconsistent guidance with respect to sheetrock repairs, first representing that permits would be required for any sheetrock repairs over 64 square feet but later stating that any repairs over 32 square feet would require a permit.  This inconsistent guidance made it impossible to timely determine what work required a permit and what work did not.  Most of the notices of violation served on Mueller Flats concerned repairs which were ultimately deemed to require a permit.

31. On May 13, 2021, the Building and Standards Commission held a hearing regarding the notices of violation served on Mueller Flats in connection with damages incurred during Winter Storm Uri.  As of May 14—one day after the Commission's hearing concerning the Mueller Flats notices of violation—the City of Austin had still not issued the necessary permits.  In many instances, repairs had already been completed, but inspectors insisted that violations were "ongoing" because the repairs had been made without a permit.

32. The delay in issuing the permits led Moses Rodriguez, an employee with the Austin Code Department, to reach out to Mitchell Tolbert, the Manager of Commercial Plan Review for the City of Austin Development Services Department.  Rodriguez implored Mitchell to expedite the permits, stating "Mitchell they need permits. . . .  They do have 16 buildings and repaired

plumbing lines to over 300 units and have extensive sheetrock repairs entire units gutted. They have a temporary boiler in front also." Instead of issuing the permits, Mitchell passed the buck to Joshua Davis, a Customer Service Representative for the City of Austin Development Services Department. Davis did not issue the permits and instead simply emphasized that any plumbing repairs in excess of "12 inches of piping" would require a permit, as would *all* sheetrock repairs.

33. On May 20, Mueller Flats again contacted the City of Austin, and reiterated that Mueller Flats could not close the violations until the City of Austin issued the relevant permits. The City subsequently removed Moses Rodriguez from the Mueller Flats case and reassigned the case to Michael Bruning and Justin Brummer.

34. On May 25, Mueller Flats again contacted the City of Austin, stating "[we] are having a hard time getting the permits pushed through." On May 26, the City sent Jay Juarez—a Commercial Building Inspector with the City of Austin Development Services Department—to conduct a site visit and determine the scope of the necessary permits. After observing that "a lot of the patch work is complete," Juarez concluded that the unfinished portion of repairs "did not seem of great significant or concern in my opinion" and that "a stand-alone permit should suffice." Marlin Hartmann (a Commercial Building Supervisor for the City) then represented that the City had "authorized the ok to issue standalone permits . . . for repairs caused by water damage." When Mueller Flats reached out for clarification regarding the permits, Mr. Juarez stated "this is somewhat new to all of us and a learning curve. We are creating rule of thumbs from here on out, I would expect."

35. Many of the repairs demanded by the City could not be completed until the units in question were vacated. Because of the conditions caused by the winter storm and the City's actions, Mueller Flats was forced to serve some residents with notices to vacate their apartments

so that repairs demanded by the City could be completed. *See* TEX. PROP. CODE § 92.054(b). However, many residents unlawfully ignored those notices to vacate, requiring Mueller Flats to initiate eviction proceedings in order to complete the repairs demanded by the City.

36. The City's ad hoc creation of rules and standards for permit approvals did not provide adequate guidance regarding what standards need to be met to obtain the permits necessary to avoid fines imposed by the City for building code violations. In addition, because the City set the eviction proceedings (regarding tenants who refused to vacate for repairs) for hearing on July 1, it was not possible for Mueller Flats to comply with the Commission's deadlines for completing repairs while also complying with state and local eviction laws. Correspondingly, there was no lawful way for Mueller Flats to fully comply with the Commission's orders as to those residents.

37. Meanwhile, the Commission began taking enforcement actions against Mueller Flats in connection with the notices of violation issued by the City's inspectors—even though the vast majority of those notices could not be closed until the City issued the relevant permits.

38. On May 20, the Commission issued sixteen different orders concerning over 85 notices of violation for 56 apartment units. The vast majority of those notices of violation concerned plumbing, sheetrock, and boiler repairs, and could only be closed by obtaining the relevant permits from the City of Austin. Because of the City's actions described above, Mueller Flats could not obtain the permits necessary to close out those notices of violation.

39. Moreover, in many instances, when inspectors returned to Mueller Flats to determine whether violations had been remedied, tenants were either not at home or did not allow the inspector into the apartment. In those circumstances, the inspectors refused to enter the apartment or conduct a reinspection to verify that the repairs occurred, such that the violations in question could not be "closed out" and continued to appear "ongoing" in the Code Department's

records.

40. The City also refused to close out many violations on the basis that Mueller Flats had not yet received a permit authorizing the repairs already made. The City further ratcheted the punishments on Mueller Flats by adding the complex to the "Repeat Offender Program." Under the ROP, a multi-family *or* single-family rental property occupied by a non-owner must register as "repeat offender" under certain conditions, including if the property receives five (5) or more notices of violation of the City Code within a twenty-four-month period, regardless of whether the property owner timely corrects the violations. AUSTIN CODE § 4-14-3(A)(2). Registration in the ROP also is required if, within a twelve-month period, a property owner fails to correct two separate violations within the time required by the Austin Code Department. *Id*. The ROP applies the same regardless of whether the violations occur on a multi-family property of nearly 400 units (like Mueller Flats) or a single-family home. In other words, five violations out of 400 units will land Mueller Flats on the ROP while a single-family home has four strikes before it will land on the ROP.

41. The alleged purpose of the ROP is "to ensure Austin renters are living in properties that meet minimum health and safety standards."[1] Initially, the program targeted only violations "for conditions that are dangerous or impair habitability." Ordinance No. 20130926-012. However, the ordinance was subsequently amended to broaden the program's reach—requiring registration for a certain number of violations, irrespective of their relationship to health or safety. Ordinance No. 20141120-003.

42. Once the City deems a property a "repeat offender," the property will remain on the public repeat offender list for a minimum of two years. AUSTIN CODE § 4-14-31. During that

---

[1] https://www.austintexas.gov/department/repeat-offender-program

time, the property owner must: pay an annual fee,[2] submit to periodic inspections of the property, and display in public areas of the property one 12-inch by 24-inch sign for every fifty units; each sign must state that the property is registered as a "repeat offender," and provide instructions for how to report code violations. *Id*. § 4-14-32—4-14-34. Further, once a property is registered in the ROP, the Austin Code Department may suspend the property's rental registration—*i.e.* prohibit the property from leasing vacant units—for any one of numerous reasons, in the Code Department's sole discretion. *Id*. § 4-14-50. Perhaps even most importantly, if the property has *any* code violations or even complaints within that two-year window, the clock restarts. For a property with approximately 400 units, this is a practically impossible standard to meet—in other words, Mueller Flats will never get off the ROP.

43. In March of 2021—less than two months after the catastrophic damage from Winter Storm URI—the City determined that Mueller Flats should be placed on the City's Repeat Offender List (ROP), citing the code violations caused by the winter storm. Prior to Winter Storm Uri, in February 2021, Mueller Flats was never required to register in the ROP.

44. Accordingly, FBCC was required to pay an annual fee, and Mueller Flats' status as a "repeat offender" has been made apparent not just in required signage on the property, but also in countless news articles that readily appear on the property's Google search results.

45. On November 22, 2021, without any prior notice or warning to FBCC, the City posted a "Notice of Suspension of Rental Rights" at Mueller Flats, which stated that the Austin Code Department suspended the property's rental registration due to "the following violations." The notice then listed thirty-five (35) case numbers and stated that the property's rental registration

---

[2] The fee recently increased from three hundred eighty dollars ($380.00) per year to four hundred twenty dollars ($420.00) per year.

could be reinstated once repairs were made/permits obtained, to correct the violations associated with the 35 cases.

46. However, the City's own records showed that thirty-one (31) of those cases were closed by the City *prior to the date of the suspension*. Of the remaining four cases, one concerned a violation at an entirely different property, unassociated with Mueller Flats, in a different part of town. In another case, the repairs in question were completed seven months prior, but Code Inspector Michael Bruning refused to close out the violation because the tenant in question would not answer calls or knocks at the door and Bruning refused to enter the unit without the tenant present. Bruning further refused to consider photos of the completed repairs in order to "close out" the violation.

47. FBCC appealed the suspension by letter to Matthew Noriega, Division Manager of the Austin Code Department. By December 1st, Noriega conceded that there were only two "active" violations—defective conditions in two units inhabited by tenants engaged in illegal activity, who refused to permit property management into their units to make repairs (and who had proven themselves immune from eviction under COVID-era jurisprudence). Noriega adamantly refused to nullify the suspension until each of the violations was "remedied" and Mueller Flats' ROP registration fee was paid.

48. On January 3, 2022, Inspector Bruning verified that repairs were completed in one of the two aforementioned units and closed that case. With respect to the other unit, the tenant refused to speak to the inspector or property management nor allow them into the unit, as he had done during each of property management's almost daily attempts to identify and repair the alleged defect the tenant reported to the Code Department three months prior. Property management advised Noriega of this on January 5, 2022. The City did not release the suspension and reinstate

Mueller Flats' rental registration until January 10, 2022.

49.  To recap, FBCC was unable to lease any vacant unit at Mueller Flats for two months because (1) it refused to pay a fine for suffering property damage during a natural disaster and (2) the tenants of two units (out of approximately four hundred units) refused to cooperate with property management and the Code Department.  And Mueller Flats inappropriately remains on the ROP.

50.  October 17, 2022, a Travis County district court vacated the Commission's orders concerning the more-than-85 notices of violation issued in Uri's wake in Cause No. D-1-GN-21-002837.  However, that vacatur provided FBCC no remedy for the suspension of its rental registration, nor any relief from the damages it sustained—and continues to sustain—due to Mueller Flats' registration as a "repeat offender."

## CAUSES OF ACTION

### Claim 1: § 1983 Deprivation of Due Process Rights

51.  The preceding paragraphs are incorporated by reference as if stated herein.

52.  In requiring Mueller Flats' registration as a "repeat offender," the City has arbitrarily and capriciously deprived FBCC of its property interest in Mueller Flats and the rental income it derives therefrom, in violation of FBCC's due process rights under the Fourteenth Amendment of the U.S. Constitution.  Punishing a landlord for property damage caused by a natural disaster bears no rational relation to any legitimate governmental interest.  Likewise, the City's suspension of Mueller Flats' rental registration for a period of almost two months, under the purported authority of the ROP, cannot be said to further any legitimate governmental interest and, therefore, violated FBCC's due process rights.

53.  The City ordinances establishing the ROP are themselves unconstitutional, by allowing the City to strip landlords of their reputations and rental income over code violations of

any kind, no matter the cause thereof, the number of units in the property, nor the landlords' diligence in attempting repairs. Ordinance Nos. 20130926-012, 20141120-003. Thus, the City is liable under 42 U.S.C. § 1983. In addition, because the two-year clock for the ROP restarts every time there is another code violation (or even complaint), it is practically impossible for Mueller Flats to ever get off the ROP.

54. The ROP ordinances, and the City's actions pursuant thereto have caused FBCC substantial damages, including—but not limited to—the loss of rental revenue.

55. FBCC seeks disgorgement and/or restitution of any and all fees and fines assessed as to Mueller Flats under the ROP, lost rental income from Mueller Flats, and all other damages, both actual and consequential, to compensate FBCC for the City's constitutional deprivations.

56. FBCC seeks a declaration from this Court that the City engaged in acts to deprive FBCC of its right to due process.

57. FBCC further seeks injunctive relief requiring that Defendants remove Mueller Flats from the ROP and prohibiting Defendants and their agents and employees from enforcing the ROP ordinances against FBCC in violation of the Fourteenth Amendment of the United States Constitution.

58. FBCC further seeks attorney's fees pursuant to 42 U.S.C. § 1988(b).

### Claim 2: Deprivation of Due Process Rights Under Texas Constitution

59. The preceding paragraphs are incorporated by reference as if stated herein.

60. In requiring Mueller Flats' registration as a "repeat offender," and suspending Mueller Flats' rental registration pursuant to its purported authority under the ROP, the City has arbitrarily and capriciously deprived FBCC of its property interest in Mueller Flats and the rental income it derives therefrom, in violation of FBCC's due process rights under Article 1, Section 19

of the Texas Constitution.  In addition, because the two-year clock for the ROP restarts every time there is another code violation (or even complaint), it is practically impossible for Mueller Flats to ever get off the ROP.  The due course of law protections provided to Mueller Flats by the Texas Constitution sweep more broadly than its Fourteenth Amendment counterpart.

61.     FBCC seeks a declaration from this Court that the City engaged in acts to deprive FBCC of its right to due process.

62.     FBCC further seeks injunctive relief requiring that Defendants remove Mueller Flats from the ROP and prohibiting Defendants and their agents and employees from enforcing the ROP ordinances against FBCC in violation of the Texas Constitution.

**Claim 3: The ROP Ordinances are Preempted by Chapter 92 of the Texas Property Code**

63.     The preceding paragraphs are incorporated by reference as if stated herein.

64.     The ROP ordinances are preempted under the Texas Constitution, because they are impermissibly inconsistent with Chapter 92 of the Texas Property Code.  *See* TEX. ATT'Y GEN. OP. JM-790 at 3739 (1987) ("Chapter 92 of the Property Code preempts the field in the area of landlord-tenant duties and remedies regarding a landlord's duty to repair leased premises.") (discussing TEX. PROP. CODE § 92.001 et seq.); TEX. CONST. ART. XI, § 5.

65.     As previously noted, under the Property Code, landlords are not required to begin repairing damage resulting from an insured casualty loss "until the landlord receives the insurance proceeds." TEX. PROP. CODE § 92.054.  Here, the City is penalizing FBCC for failing to repair damage caused by a winter storm—insured casualty losses—for which FBCC had yet to receive insurance proceeds.  Thus, the City's actions directly conflict with § 92.054 and, therefore, are unlawful.  Moreover, even if no "direct conflict" were presented, "Chapter 92 of the Property Code preempts the field in the area of landlord-tenant duties and remedies regarding a landlord's duty

to repair leased premises." AG Op. JM-790, at 3739.  What's more, the City may not impose any duty or liability upon a landlord which is not set forth in the Property Code.  *See* TEX. PROP. CODE § 92.061.  Accordingly, the challenged ordinances are preempted.

66. FBCC seeks a declaration that the ROP ordinances are preempted.

67. FBCC further seeks injunctive relief requiring that Defendants remove Mueller Flats from the ROP and prohibiting Defendants and their agents and employees from enforcing the ROP ordinances against FBCC.

**Claim 4: § 1983 Unconstitutional Taking in violation of the Fifth Amendment**

68. The preceding paragraphs are incorporated by reference as if stated herein.

69. The City has unreasonably interfered with FBCC's rights to use and enjoy Mueller Flats by publicly listing Mueller Flats as a "repeat offender," requiring FBCC to display large signs announcing its status as a "repeat offender" in common areas of Mueller Flats, and suspending Mueller Flats' rental registration.  In addition, because the two-year clock for the ROP restarts every time there is another code violation (or even complaint), it is practically impossible for Mueller Flats to ever get off the ROP.  Such interference has diminished the rental value of units at Mueller Flats, the overall property value, and directly caused lost rental income.  These actions constitute an unconstitutional taking without just compensation in violation of the Fifth Amendment to the United States Constitution.

70. FBCC seeks a declaration that the ROP ordinances are violative of the Texas Constitution.

71. FBCC further seeks injunctive relief requiring that Defendants remove Mueller Flats from the ROP and prohibiting Defendants and their agents and employees from enforcing the ROP ordinances against FBCC.

72. FBCC seeks compensation for diminution in the rental value of units at Mueller Flats, lost rental income, and all other damages, both actual and consequential, to compensate it for the City's unconstitutional taking.

**Claim 5: Unconstitutional Taking in violation of Article I, Section 17 of the Texas Constitution**

73. The preceding paragraphs are incorporated by reference as if stated herein.

74. The City has unreasonably interfered with FBCC's rights to use and enjoy Mueller Flats by publicly listing Mueller Flats as a "repeat offender," requiring FBCC to display large signs announcing its status as a "repeat offender" in common areas of Mueller Flats, and suspending Mueller Flats' rental registration. In addition, because the two-year clock for the ROP restarts every time there is another code violation (or even complaint), it is practically impossible for Mueller Flats to ever get off the ROP. Such interference has diminished the rental value of units at Mueller Flats, decreased the overall value of the property, and directly caused lost rental income. These actions constitute an unconstitutional taking without just compensation in violation of the Fifth Amendment to the United States Constitution.

75. FBCC seeks a declaration that the ROP ordinances are violative of the Texas Constitution.

76. FBCC further seeks injunctive relief requiring that Defendants remove Mueller Flats from the ROP and prohibiting Defendants and their agents and employees from enforcing the ROP ordinances against FBCC.

77. FBCC seeks compensation for diminution in the rental value of units at Mueller Flats, lost rental income, and all other damages, both actual and consequential, to compensate it for the City's unconstitutional taking.

**Claim 6: Violation of the First Amendment and Article I, Section 8 of the Texas Constitution**

78.     The preceding paragraphs are incorporated by reference as if stated herein.

79.     FBCC would show that it desires to engage in the exchange of truthful and valuable information about commercial and noncommercial subjects.

80.     The provisions of the City ordinances governing the ROP which mandate the placement of specific signage on registered properties are an unconstitutional content-based regulation of commercial speech as applied to FBCC, because they mandate speech that FBCC would not otherwise make—thereby necessarily altering the content of FBCC's speech. Specifically, FBCC would not post signs notifying residents and prospective tenants that Mueller Flats is registered as a "repeat offender" if it was not required to by the ROP ordinances.

81.     The signage requirements in the ROP ordinances serve no compelling, nor substantial, governmental interest.  Even assuming, without admitting, that the signage requirements serve any compelling and substantial governmental purpose, the signage requirements do not directly and materially further such purpose and are not a narrowly tailored means of accomplishing such purpose.

82.     Accordingly, the signage requirements in the ROP ordinances violate the First Amendment of the U.S. Constitution and Article I, Section 8 of the Texas Constitution.

83.     FBCC seeks a declaration that the signage requirements in the ROP ordinances are violative of the First Amendment of the U.S. Constitution and Article I, Section 8 of the Texas Constitution, both facially and as applied to FBCC.

84.     FBCC further seeks injunctive relief requiring that Defendants remove Mueller Flats from the ROP and prohibiting Defendants and their agents and employees from enforcing the signage requirements of the ROP ordinances against FBCC.

85. FBCC further seeks compensation for diminution in the rental value of units at Mueller Flats, lost rental income, and all other damages, both actual and consequential, to compensate it for the deprivations caused by the City.

## JURY DEMAND

86. FBCC demands a jury trial on all claims that may be tried to a jury.

## PRAYER FOR RELIEF

Wherefore FBCC respectfully requests:

a. Hold unlawful and set aside the decision to place Mueller Flats on the repeat offender list;

b. Declare that the Repeat Offender List is unlawful and violates the U.S. and Texas Constitutions;

c. Issue a permanent injunction enjoining the City of Austin from retaining Mueller Flats on or returning Mueller Flats to the Repeat Offender List;

d. Award compensatory damages;

e. Award just compensation;

f. Award costs and reasonable attorney's fees; and,

g. Award such other and further relief as the Court deems equitable and just.

Respectfully submitted,

TERRAZAS PLLC

*/s/ Kevin Terrazas*
Kevin Terrazas
State Bar No. 24060708
Eric Hudson
State Bar No. 24059977
1001 S. Capital of Texas Hwy
Bldg L, Suite 250
Austin, Texas 78746
(512) 680-3257
kterrazas@terrazaspllc.com
ehudson@terrazaspllc.com